With your argument now, the case of Weaver v. Berryhill. Mr. Rodman. Your Honors, may it please the Court. My name is Jason Rodman and I represent the appellate Donna Weaver and I will be aiming to preserve around three minutes for rebuttal. This is also a social security disability case in which benefits were denied. This is a step four case in which the ALJ opinion asserts that she can do past work. So this is a case about a particular narrow kind of diabetes. It's about long-term, uncontrolled, type one, brittle diabetes. And you would not know that from reading the ALJ opinion. And so I'm going to focus on two primary things today. First, the ways in which that detailed type of diabetes was not accounted for in the opinion. And the manifestations from it were not accounted for in the residual functional capacity that the ALJ opinion purports. And then secondarily, that the credibility analysis was also flawed. So first, the ALJ opinion does acknowledge that on page 4 AR 20 that the blood sugar drops. But, and also on page 9 AR 25 that, you know, there were some emergency room visits acknowledged by the ALJ as real events. And then third, that at least one doctor on page 10 AR 26 called the blood sugar drops, quote, intermittent. But it is Weaver's position to say that those things are not sufficient. In fact, this is a lady who has exhibited poor control of her type 1 diabetes for 30 years. Endocrinologists could not control it. Endocrinologists opined that she does not recognize when her glucose is low. It is not just, like as I said at the top, it is not just diabetes, but type 1 and brittle diabetes and long-term uncontrolled diabetes. And in terms of... To repeat what I said the first time, you are simply restating your client's position. You need to make a legal argument about why the ALJ's decision is not supported by substantial evidence. Right. I looked in your brief for such an argument and do not find it. Okay. Nor did I find it in West. This is your opportunity to make that argument. Okay. Campbell versus Estrue, Seventh Circuit, 2010, says an ALJ may not selectively discuss parts of a physician's report that support the finding of disability and ignoring other portions that suggest disability. But the points that I have already discussed illustrate that that is going on here, which is problematic. And I am going to move to my second point, much as I will probably come back to my first one later on. My second point goes to credibility. And in terms of credibility, the Bjornsson case, 2012, requires that a court not... Excuse me, specifically an ALJ, an administrative logic decision in a social security case, does not overemphasize daily activities. And this comes out specifically, and it seems to be a common feature in ALJ opinions, that these activities are overemphasized either because someone is helping or because they are not performed at a level comparable to a work environment, or they are not performed at the pace of a work environment, which is to say, in layman's terms, it is unfair to use those things against them as if they are work. And so here, she is working a part-time job at Dollar General, 20 hours, a little over 20 hours a week. It looks like there is one week where she works 39, and one week after that she works 34 and a half. But she is not working full-time on an ongoing basis or anything like that. And so there, those factors in Bjornsson come in line, and I believe the lead case is Lanigan, that part-time work should not be equated to full-time work. And that happens here, and it is a problem. Similarly, with driving, it is an activity. Yes, it is something, this is discussed in the briefing, that is associated with freedom and something someone is going to do even if they can't do it at the level that would be work equivalent. And the ALJ opinion here suggests that, well, how can you be driving or even driving your grandson around? But again, with the child care situation we have in this country, that doesn't take into account the obvious economic realities that you are going to drive a grandson around if you are helping your son out if you need to, even though she has had at least one episode where she had to stop the car, apparently, and no major accident occurred. But the point is that is not work comparable, and that is a problem. And then, similarly, as the care for grandchildren. And an issue, counsel, of the work comp, was Ms. Weaver's right thumb amputation due to a work-related injury in her position as a machine operator? Does the record reflect on that? Honestly, I'm not sure off the top of my head, but that's something I can attempt to answer with greater information on rebuttal. And unless your honors have further questions for me at this time, I'd like to rest and reserve my time for rebuttal. Certainly, counsel. Ms. Cohn. May it please the court. My name is Emily Cohn on behalf of the acting commissioner in this case. Your honors, the ALJ's decision was supported by substantial evidence, most importantly, the opinion evidence in the record. No opinion was more restrictive than the ALJ's residual functional capacity. The opinions consisted of Ms. Weaver's endocrinologist prior to the machinery and hazards. The ALJ accepted and adopted this opinion. Further, during the consultative exam with Dr. Schottmeyer, he opined that Ms. Weaver should not work around machinery due to her amputated thumb. Again, the ALJ accepted this opinion. The state agency reviewing physicians opined that she did not have any severe impairments. However, the ALJ found those opinions did not go far enough in restricting Ms. Weaver because of her diabetes. Ms. Weaver argues that the ALJ erred by not identifying and giving credence to her brittle type 1 diabetes. However, Ms. Weaver's arguments are based on symptoms that simply did not exist in the record. While Ms. Weaver identifies a host of symptoms usually associated with brittle diabetes, those symptoms were simply not present and the ALJ was not obliged to address them. Furthermore, Ms. Weaver refers to the fact that her diabetes was long-term and uncontrolled for more than 30 years. However, the record reflects that she worked with this condition at substantial gainful activity levels up to her alleged onset date. In fact, her last full-time job ended because the plant closed down in which she was working, not because of her impairments. The ALJ did not cherry-pick the evidence. He simply addressed the evidence in the record and the fact that that evidence did not exist should not be held against the ALJ. To address Ms. Weaver's concerns about the ALJ's credibility analysis, while the ALJ did consider the fact that Ms. Weaver was able to maintain a part-time job, sometimes working more than 30 hours per week as a cashier, and drive her grandson around and care for her grandson three days a week, this was not the crux of the ALJ's evaluation. The ALJ looked also to objective medical evidence and the opinions in the record. Council brings up the case of Lanigan, cited at 865 F. 3rd 558. This is a case in which the ALJ improperly held council's part-time work against him. However, this case is distinguishable for several reasons. In Lanigan, the part-time work lasted only six weeks. Here, the ALJ noted it lasted 11 months. Further in Lanigan, there was evidence that the part-time work was accommodated. Here, there was none. The ALJ asked Ms. Weaver about her accommodations at work and yet found insufficient evidence supporting any allegations of accommodated work. The ALJ did not rely on Ms. Weaver's activities as equating them to full-time work, but rather properly consider them as part of the symptom analysis as lined out in the regulations 404 1529. The ALJ looked at all of Ms. Weaver's conditions, consider them in combination, and gave thorough examination to all of them. Yet, his finding that she could complete the jobs or her past relevant work as an auto clerk and a retail stocker line up with her own testimony that she was able to complete cashier work 20 hours a week and that worked for her with many, many years with her diabetes at substantial gainful activity levels. If your honors have no further questions, the commissioner would ask that the court uphold the ALJ's decision and we will rest on our brief. Thank you, counsel. Anything further, Mr. Rodman? Yes, your honor, briefly. In response to the thumb amputation, she worked for a period of time with the thumb amputated. I don't know the exact cause of it. I am sorry about that, but I haven't made it the focus of my analysis because she's a trooper and she went back to work even with that thumb amputated. The diabetes we've talked about has caused nerve damage in her hands, in her feet, and in her stomach. Apparently, something is going on with her kidneys because of the diabetes. There aren't any functional limitations connected in the hands in the RFC either. I want to address some of the things that the commissioner has brought up today. In terms of refuting, I believe it's Lanigan, with regard to the part-time work, in the briefing, the commissioner cites the Berger case. But the Berger case involved someone working part-time as a carpenter, where that person was working at a medium level, well above the light level that was in the RFC. Whereas here, she's working part-time in basically the same level of work. She's working three days a week. She gets tired. She leans on the counter when she has episodes, and her boss is really understanding and lets her take breaks, which is effectively accommodation type things. I also wanted to address some of the things about non-compliance that are addressed in the briefing, and to some extent, the commissioner addressed this morning. The lead case that the commissioner, and the district court to some degree, puts out there in terms of non-compliance is the Castile case, 2010, from this court. There, the person failed to go to physical therapy and pain management. Whereas here, it's a whole different animal. This lady has had 30 years poor control, and yes, it's true that she worked for a while. She's a trooper. She goes out there and does her best. But she's also gone a period of time where she hasn't been able to afford test trips. She went for a two-year period where she didn't have any insurance, so she didn't get any treatment for it. But with the level of diabetes she has, with the level of damage it's doing to her body, that objectively supports, and this is based on some medical research, that objectively supports that it's not that those symptoms aren't there. Those symptoms would actually worsen and become more credible because she endured that period. Yes, that means she arguably did it to herself, but that's not the test that the SSA is looking at. I also wanted to talk about this, the Dixon case from 2001. I believe this is the district court. I don't know off the top of my head whether the commissioner has cited it. But in that case, it's about failure to comply with a diet in a diabetes case. And this court looked at that case in 2001. And you think, oh, well, that carries weight because it's about diabetes. But that was about ordinary garden variety recently diagnosed with diabetes that ran high. And here, the technology recommended is far more complicated, and it's been tried. The glucagon only works if you have a warning. And for these reasons, we ask that you remand. Thank you. The case is taken under advisement.